## SOCONY–VACUUM OIL CO., Inc., v. PREMEAUX et al.

### No. 4281.

Court of Civil Appeals of Texas.

March 15, 1945.

Rehearing Denied April 18, 1945.

Lipscomb & Lipscomb, of Beaumont, for appellant.

Marcus & Carrington, of Beaumont, for appellees.

WALKER, Justice.

This is an action based on the Jones Act, 46 U.S.C.A. § 688. On trial appellees were plaintiffs and appellant was defendant, and throughout this opinion the parties will be referred to as they were below. Plaintiffs alleged, in substance, that their son, Karis Premeaux, was employed by defendant as a messman on board defendant's ship Stanvac Calcutta; that by reason of various negligent acts and omissions on defendant's part, the seaman contracted tuberculosis during the voyage of his ship; that defendant was likewise negligent in divers respects in failing to provide medical advice and treatment during the voyage and thereafter; and that by reason of each and all of the various matters so plead, the seaman's illness resulted in his death. Plaintiffs sought recovery for damages for pain and suffering occasioned the seaman. It is unnecessary to summarize allegations respecting negotiations of settlement between defendant and the seaman nor to summarize allegations respecting plaintiff's pecuniary loss "occasioned by the death of the said Karis Premeaux."

The action was brought originally by the seaman against the defendant as his employer, as well as against other defendants; but the present plaintiffs were substituted on the seaman's death, and prior to the trial all defendants other than appellant were dismissed. No question arises on the record as to the capacity of plaintiffs to maintain this suit.

It appears that the seaman was employed by the defendant during the early part of 1942 to serve as a messman aboard the ship Stanvac Calcutta, a tanker operated by defendant, and registered under the flag of Panama. He was then about 26 years of age. He went aboard his ship and entered upon the performance of his duties, and during the course of the voyage (which extended to ports of the Caribbean Sea) became ill. When the vessel arrived at the port of Aruba, N. W. I., he left her and entered a hospital there. This occurred on

the 5th or 6th of May, 1942. While in this hospital he was examined by a physician and his illness was diagnosed as pulmonary tuberculosis, moderately advanced. He remained in the hospital until the 20th or 21st of May, 1942, when he left it and went aboard the ship Peter Hurll; and by that ship he was repatriated to the United States. He landed in New York June 4, 1942. It appears that examination and treatment at Aruba and repatriation to the United States were at the instance of defendant. On landing in New York, he proceeded immediately to certain offices of the defendant where he consummated a transaction with defendant's claims investigator Ramsey, resulting in the payment to him by defendant of the sum of $525. Defendant contends that this was a conscious and deliberate settlement and discharge of the cause of action sued upon herein. Plaintiffs allege, in substance, that it was no more than the payment to and collection by the seaman from the defendant of certain wage and bonus moneys accruing to him under his contract of employment. It is established that the seaman at this time executed and delivered to defendant a formal release, and a cash voucher bearing on its face words of release, each of which amounted to a specific release and discharge of the causes of action alleged herein. Plaintiffs' pleadings attacked these releases on various grounds.

A few hours after the completion of this transaction, the seaman went aboard a Greyhound bus in New York and proceeded to his home, which was situated in Nederland, in Jefferson County, Texas. The dates and times of his movements subsequent to June 4th and prior to October 26, 1942, cannot be fixed with precision. However the testimony shows that the seaman remained at this home until sometime later, apparently in June, 1942, when he made a voyage extending over about six days aboard the ship W. W. Mills. Immediately or shortly thereafter, it appears that he entered the marine hospital at Galveston and remained there for a week or ten days; that he was examined by and was directed by the authorities at this hospital to proceed to a marine hospital at Chicago, apparently because tubercular patients were not cared for in the Galveston hospital; and that he complied with these instructions and entered the Chicago hospital. The evidence shows that he remained in the Chicago hospital for an indeterminate time,

to-wit, a week or longer. He left that hospital for reasons not apparent and not covered by the testimony, and at some date not clearly shown returned to Nederland. Subsequently, on October 26, 1942, he entered the Jefferson County Tuberculosis Hospital and remained there until his death on April 14, 1943. The parties have stipulated that the Stanvac Calcutta was lost at sea with all hands on some date after May 5, 1942, and before September 1, 1942.

The foregoing disagrees materially with plaintiffs' brief as to the seaman's movements after he left New York. Plaintiffs say that the seaman first applied to the Galveston marine hospital and then to the Chicago marine hospital and was refused admittance in each instance because he had no certificate of discharge from his ship; that he then made his voyage aboard the W. W. Mills to obtain such a discharge, and that on his return from this voyage he entered the Jefferson County Tuberculosis Hospital (which incidentally is not shown to be a marine hospital). We are satisfied however that the statement made by us is correct.

Trial was to a jury. Only one ground of negligence was submitted. The jury found that defendant failed to furnish the seaman "with proper hospitalization and medical treatment after May 20, 1942," which "aggravated or accelerated his tubercular condition," this resulting in "personal injury" to the seaman. The jury also found that the failure to furnish hospitalization and treatment was negligent, and that this negligence was a proximate cause of the seaman's injury. The jury found a verdict for $3,000 damages for physical and mental pain and suffering resulting to the seaman from the aforesaid aggravation or acceleration of his disease, and further found that $1,050 "would have been the fair and reasonable cost of hospitalization and medical treatment of Karis Premeaux between May 20, 1942, and the date of his death on April 14, 1943."

Issues covering certain aspects of the negotiations between the seaman and defendant's agent Ramsey on June 4, 1942, were submitted. The jury found that the seaman did not understand "that the document signed by him in New York was in full and complete settlement of any and all claims," and that he did not advise "the defendant's agents that he wanted to make a money settlement with the defendant company and return to Texas for hospitaliza-

tion." However, they also found "that the release offered in evidence was executed freely without deception or coercion," and further, that the seaman "before reaching New York was advised that he had pulmonary tuberculosis, moderately advanced." It is unnecessary to refer to any other special issue.

Judgment was rendered in behalf of plaintiffs on this verdict, except that pursuant to stipulation a $500 credit was allowed on the $1,050 referred to. We infer that this was based on the $525 payment made to the seaman on June 4th.

We first note that while the seaman sailed aboard a ship under Panamanian registry, the parties have stipulated "that the plaintiff (an obvious reference to the seaman) was an employee of Socony-Vacuum Oil Company and as such was entitled to prosecute a suit under the Jones Act to the same extent as if he had been aboard an American flag vessel." This stipulation operates in favor of the present plaintiffs, removes from the record any question as to whether the law of Panama is applicable, and requires that the law of this country be applied.

The merits of this appeal will be determined by our conclusions respecting negligence and proximate cause, and we have found it unnecessary to determine any issues arising on defendant's plea of release.

[1] The basic duty involved in this case, the duty owed the seaman by his employer on which any finding of negligence depends, is the duty established by the ancient law of the sea requiring the employer to furnish maintenance and cure to a seaman who becomes ill or is injured while in the service of his ship. Maintenance refers to food and lodging, and cure refers to care and includes medical care and treatment. This duty is imposed by law as an incident of the relation of employer and seaman, irrespective of the fault of the employer, and for wrongful breach thereof resulting in physical harm, the seaman himself had a cause of action for damages under the general maritime law. We refer generally to Cortes v. Baltimore Insular Line, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368; Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993; and Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239, 244. The Jones Act, 46 U.S.C.A., § 688, vested the seaman with a right of action for per-

sonal injuries, sustained in the course of his employment and caused by his employer's negligence; and under this statute the seaman had a cause of action for a negligent breach of the aforesaid duty to furnish maintenance and cure. This statutory cause of action, although overlapping to some extent the cause of action recognized by the general maritime law, was separate and distinct therefrom and survived the seaman's death. Death abated the seaman's cause of action for damages for injuries under the general maritime law. Cortes v. Baltimore Insular Line, supra. Breach of this duty in only one respect has been submitted to the jury, namely, as to whether defendant negligently failed to furnish proper hospitalization and medical treatment to the seaman after May 20, 1942; and in determining whether the findings of negligence and proximate cause can stand or can be given any effect it is necessary to consider first the period from May 20 to June 4, 1942, and then consider the period after June 4th.

(2) The seaman evidently went aboard the Peter Hurll immediately after he left the Aruba hospital on May 20, 1942, or perhaps May 21, and remained on this vessel until June 4. He is the only witness whose testimony covered the voyage and the following excerpt from his deposition is everything he said or was asked about his treatment on board ship:

"Q. How were you brought back to the United States? Did you work or stay in bed? A. Well, the doctor required that I was to be sent back in the hospital room on the ship; but they put me on the back end of the ship, right next to the toilet, with that water running and everything, and had four other dirty mattresses and stuff piled up in the corner on one bunk. That running water, the toilet was running right in my room."

The paucity of evidence respecting this voyage, considering the time (about 14 days) the voyage covered, has forceably reminded us that the seaman failed to say that his rest was interrupted by the characteristics of his room or by anything else, and that no complaint to anyone on board the Peter Hurll nor any request to be given other accommodations has been shown. He did not even undertake to state that he occupied this room throughout the voyage. Although he makes some complaint of the mattresses, he does not show that he ever requested their removal. His objection to

the toilet seems to be limited to the fact that water ran in it. If the apparatus was used, he does not say so. He says that he was not placed in the hospital room as the doctor required but was put at the back of the ship. He does not say that the location of his room interfered with his rest nor that he ever complained about this matter or asked to be moved to the hospital room. It may or may not have been wrongful to place him elsewhere than in the hospital room, for any room where he could rest and be treated would do well enough. It may be that he would not have been as sensitive of the vessel's motion in the hospital room, but the evidence does not show where that room was located. He actually makes no complaint of the vessel's motion and relates no incident of the voyage; presumably he was accustomed to the motion of the vessel since his testimony showed that he had gone to sea off and on for seven or eight years. His failure to testify about such matters, all of which presumably lay within his knowledge, strongly suggests that his voyage aboard the Peter Hurll did him no harm and that the plaintiffs attached no real significance to it as an element of their case.

There is no evidence as to whether the seaman did or did not receive medical treatment on board this ship. The reference to the hospital room indicates that some character of medical treatment was available but we have found nothing else touching the matter of medical treatments.

The only direct evidence as to the effect which this voyage had on the seaman's condition consists of diagnoses made in Aruba and in New York on the day the seaman landed. We think it clear that the seaman's condition was actually diagnosed in Aruba as pulmonary tuberculosis, moderately advanced· We could not say otherwise without repudiating the jury's finding that before reaching New York the seaman was advised that he had pulmonary tuberculosis, moderately advanced, and we have noticed that this diagnosis was one of the assumed facts in the hypothetical question addressed to Dr. Sutton on the trial below by plaintiffs, while showing that the seaman's disease was incurred or was activated during the course of his voyage on defendant's ship. The New York diagnosis appears from a stipulation that the seaman "had his condition diagnosed as moderately advanced pulmonary tuberculosis when examined in New York City on or about June 4,

1942." The recommendations of the Aruba physician are not entirely clear, but the seaman testified that "the only thing he told me, he says I ought to rest for a year and I would be all right," and Dr. Carrell's letter to the seaman, after referring to an improvement, states that "however, since we are not adequately equipped for the handling of tuberculosis, we feel it advisable that you return to the United States for such treatment as is indicated. You are now being discharged to the United States as a passenger. You are unfit for work." Ramsey's deposition states that the New York doctors' "diagnosis and recommendation was that (the seaman) be under observation for pulmonary tuberculosis and receive hospitalization, x-rays and laboratory studies." The only medical testimony given below was that of Doctors Cunningham and Sutton, which was adduced by the plaintiffs, and neither witness testified as to the effect which this voyage might have had on the seaman. The substance of their testimony was that a person having tuberculosis, moderately advanced, should receive treatment, and the treatment indicated by them consisted of rest and proper food. Dr. Cunningham referred to the use of pneumothorax in "some cases." The following excerpt from his testimony shows the technical meaning of the term pulmonary tuberculosis, moderately advanced:

"That is a classification that is made by the National Tuberculosis Association. Your moderately advanced cases—moderately advanced is according to the x-ray findings; a man with a moderately advanced case might have all of one lung involved, or he might have half as much similar involvement in both lungs. He could have a small cavity in the lung and still be a moderately advanced case. It is really a classification that is set by the National Tuberculosis Association, so that all doctors would use about the same classification; and it is really what we find on the x-ray picture."

The seaman testified that when he was in New York he was ill and had a temperature of 102 degrees.

The seaman's statement that the doctor required him to be sent back in the hospital room on the ship indicates that it was proper for defendant to return the seaman to the United States at this time, by the particular mode of transportation and on board the particular ship selected. There is no evidence to the contrary and there is some

supporting evidence in Doctor Carrell's aforesaid letter to the seaman.

Under the issues submitted, negligence consisted in failure to furnish proper hospitalization and medical treatment to the seaman, and the question of proximate cause depended on how this negligence affected the seaman's condition. The matter of proximate cause will be considered first.

It can not be determined from the evidence that the voyage had any adverse effect whatever on the seaman's condition. Since the general diagnoses in Aruba and New York were the same, it is to be inferred that the voyage caused no determinable change, although the meaning of the term pulmonary tuberculosis, moderately advanced, is not sufficiently precise to justify more than a rough inference. As respects the period from May 20th to June 4th, plaintiffs have failed to adduce any evidence of proximate cause.

The evidence respecting negligence is almost as scanty. On first reading, the seaman's testimony shows that he was mistreated, but the failure to touch upon so many significant matters suggests that he was more dissatisfied with being deprived of what he thought his legal due (what the doctor prescribed) than with the treatment he actually received. The proof however fails as to negligence because plaintiffs did not show that defendant was responsible for the seaman's treatment on board the Peter Hurll.

Plaintiffs show only that defendant caused the seaman to be transported to New York on board the Peter Hurll. It has not been proven that this vessel was operated or in any way controlled by defendant. The parties made several stipulations concerning the voyage which are ambiguous as respects defendant's relation to the operator of the Peter Hurll, but they apparently intended to stipulate only that defendant caused the seaman to be transported from Aruba to New York by this particular vessel. The Peter Hurll was owned by the Standard Oil Company of New Jersey and presumably was operated and controlled by that company. The arrangement between defendant and the operator of the Peter Hurll respecting the seaman's carriage is not shown. Proof that defendant caused the seaman to be transported to New York on board a vessel owned, operated and controlled by someone else does not necessarily establish defendant's liability for the way the seaman was treated during the voyage. Although defendant's duty to provide the seaman with maintenance and cure during this voyage was contractual at least in source—it may be roughly so described because it is implied as an incident of the seaman's relation to his employer (Cortes v. Baltimore Insular Line, 287 U. S. 367, 53 S.Ct. 173, 77 L.Ed. 368)—the question is not whether defendant delegated performance of this "contract" to an independent agency but, instead, is whether defendant performed the contract by selecting a competent agency, or rather, since the burden of proof was on the plaintiffs to show negligence, whether defendant failed to perform the contract by reason of selecting an improper or incompetent agency. The defendant's "contract" was not to cure but was to provide care. The Pochasset, 1 Cir., 295 F. 6; The Mars, 3 Cir., 149 F. 729; or putting it another way, to provide means of care, and it has been so described. The Mars, supra. This obligation has its limitations. Under some circumstances the shipmaster (who is, of course, the employer's agent) may consider the interests of others than the seaman, and the rough treatment available from master and crew is all that need be furnished, despite availability of better treatment elsewhere; this is the situation where the master must determine whether to go into an intermediate port or continue with the voyage. The Iroquois, 194 U.S. 240, 24 S.Ct. 640, 48 L.Ed. 955, at page 958. Thus what we have termed defendant's contract is met by the exercise of such care and judgment as the circumstances require, for the measure applied to the duty in the above instance must be applied generally. That a high degree of care is required of the seaman's employer does not affect the nature of the employer's duty; it remains a duty only to exercise care. Accordingly, if the employer selects an independent agency to repatriate the seaman and provide him with maintenance and cure during the voyage, it would seem that all he need do is exercise care to provide a fit and proper agency. It has, in substance, been so held as regards independent physicians. Ship's officers, having selected a physician (The Van der Duyn, 2 Cir., 261 F. 887; The Hanna Nielson, 267 F. 729; The Hanna Nielsen, 2 Cir., 273 F. 171; Sanders v. South Atlantic Steamship Co., 49 Ga.App. 716, 176 S.E. 529), or having selected a physician shown to be competent (The Sarnia, 2 Cir., 147 F. 106), can ordinarily follow his medical advice and are not responsible for his er-

ıɔ.ː in judgment, though serious. Circumstances, of course, may not permit the application of this rule. The Svealand, 4 Cir., 136 F. 109. Where the employer has exercised care to select a competent physician, he is not liable for the physician's negligence or mistakes. The C. S. Holmes, D. C., 209 F. 970; Bonam v. Southern Menhaden Corp., D.C., 284 F. 360. In Campbell v. The Frank Gilmore, D.C., 43 F. 318, the court said that "neither are (the employers and boat owners) at all responsible for the treatment which the libelant's injured leg received at the marine hospital"; and we note that in Sitchon v. American Export Lines, 2 Cir., 113 F.2d 830, a release based upon the marine hospital's diagnosis bound the seaman although he had evidence to show the marine hospital's doctors mistook the extent of his injuries. The opinion does not show whether the seaman did or did not enter this hospital at the instance of his employer, and if considered, this fact was evidently given no significance. We think the rule applied to the selection of an independent physician is applicable to the selection of an independent ship for such purposes as defendant had in mind in engaging the Peter Hurll to repatriate the seaman here.

■ The Jones Act, by referring to and adopting relevant portions of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., which makes the employer liable for the negligence of his officers, agents, and employees, may have enlarged the employer's liability in some instances (De Zon v. American President Lines, 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065), but not where an independent agency has been employed. An independent contractor is not an officer, agent or employee within the meaning of the Federal Employers' Liability Act, at least, where the employer's duty is not absolute. Chicago, R. I. & P. R. Co. v. Bond, 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735; Robbinson v. Baltimore & O. R. Co., 237 U. S. 84, 35 S.Ct. 491, 59 L.Ed. 849; Klar v. Erie R. Co., 118 Ohio St. 612, 162 N.E. 793; Rexroad v. Western M. R. Co., 162 Md. 566, 160 A. 730; Reynolds v. Addison Miller Co., 143 Wash. 271, 255 P. 110.

■ These principles apply here. The Peter Hurll was an independent ship; as stated, such evidence as is in the record indicates that the vessel was proper transportation and a proper ship, at the time selected, with accommodations on board which satisfied the seaman's physician.

Prima facie, this amounted to a performance of defendant's duty to the seaman, or as we have previously put it, fulfilled defendant's contract. The evidence fails to show whether the seaman did or did not receive medical treatment, although it indicates that treatment of some character was available. We have considered whether it might be proper to infer from what the seaman got that this was what defendant arranged he should get, but conclude that this inference cannot be drawn here. The seaman says that the doctor required him to be sent back in the hospital room but "they" put him in another room. His testimony suggests that he knew who "they" were, but he does not say who "they" were. Our inclination is to think "they" were officers of the Peter Hurll, and it seems more logical to infer that defendant engaged such quarters as the physician required and that some officer of the Peter Hurll disregarded this arrangement for reasons affecting his own ship and crew than it is to infer that defendant, after having undertaken to provide the seaman with a doctor, deliberately set aside the physician's advice and procured improper quarters. If the Peter Hurll had been a passenger ship, it might be readily inferred that what the seaman got was what the defendant undertook to provide, but the evidence does not show what kind of a ship she was. The vessel may have been a tanker, and the quarters available on board are not indicated. The seaman's description of his quarters suggests empty crew quarters but this is pure inference. The record suggests that the seaman knew more than he undertook to tell, and we feel no inclination to draw inferences with this failure of proof before us. In the final analysis, plaintiffs have failed to show that the treatment given the seaman from May 20th to June 4th was anything other than the independent act of an independent agency, have failed to show that defendant was negligent in selecting this agency or in arranging for the seaman's transportation thereby to New York, and have accordingly failed to raise the issue of negligence as respects the period to June 4th.

■ (3) As respects the period after June 4, 1942, it is a novel feature of this appeal that the defendant has been charged with a violation of the duty to furnish maintenance and cure after performance thereof was interrupted by defendant's purported settlement of June 4, 1942. In such a situation the employer could be expected

to discontinue performance of this duty, acting in perfect good faith and under the belief that no further duty was owed, at least down to the time that demand is made for further performance, and on the record before us, we need not go beyond this point. By reason of the seaman's own act, indicating his consent, there is nothing to impel performance and hence no lack of care in the employer's failure to perform. There is no duty to act under these circumstances, and to charge the seaman's employer with negligence will require either that the employer be guilty of bad faith in connection with the settlement, or that the settlement itself be wrongful ab initio under some rule of law.

It is unnecessary to state the testimony in detail, relating to the settlement transaction of June 4, 1942. Defendant contended that this amounted to a specific compromise and settlement of the cause of action involved in this case. Plaintiffs do not deny that a settlement of some kind was made but say that it was limited to the disposition of claims for wages and bonus.

It is established that when the transaction took place on June 4, 1942, the seaman had pulmonary tuberculosis, moderately advanced, and that both parties knew this. Both parties also knew that treatment and cure of the disease might require an extended time. Defendant's agent Ramsey testified that he knew it required an extended time, although not how long a time. In answer to special issue No. 11, the jury found that the seaman had been advised before reaching New York that he had pulmonary tuberculosis, moderately advanced, and by deposition taken not long before his death, the seaman testified "the only thing (the Aruba physician) told me, he says I ought to rest for a year and I would be all right."

Claims investigator Ramsey, who acted for defendant in making the purported settlement, testified in substance that the seaman's ailment was discussed before the execution of the release, that the seaman himself raised the question of money settlement, and said he did not want to go into the marine hospital on Staten Island but preferred to go home and enter the marine hospital at Galveston. Ramsey further testified that the seaman understood and assented to the execution of the releases pleaded by the defendant and showed that he accepted the sum paid him as consideration therefor. His testimony was supported in material respects by defendant's agent Roland. The seaman testified in substance, by the deposition referred to, that his disease was not discussed; that the question of maintenance and cure was not raised; that he was not tendered maintenance and cure by the defendant; that the only thing discussed was his pay; that he did not sign a release, or if he did he did not know it. He described the payment made to him as "the rest of my money" and said, "I just signed for my pay; that's all."

On the testimony of the seaman, the defendant was guilty of positive deception in procuring the execution of the releases and either knew that the seaman never realized he was releasing the cause of action involved herein or else had such information that only bad faith prevented the discovery of that fact. On such a statement, the defendant's duty to furnish maintenance and cure to the defrauded seaman would not be interrupted, and the purported settlement would aggravate defendant's wrong instead of obviating it. However, the jury have found in response to special issue No. 10 that "the release offered in evidence was executed freely without deception or coercion," and have thus repudiated every element of the seaman's story which suggests bad faith on defendant's part, either in procuring the release or in acting on the assumption that it was valid and discharged any further obligation to the seaman.

Was the defendant under such an obligation to the seaman, did the defendant owe the seaman such a duty respecting maintenance and cure, as to make any settlement, or the particular settlement in evidence, wrongful ab initio? We do not think so. Beyond question the relation of seaman and employer is unique and under this relation the employer's duty to provide the seaman with maintenance and cure may be very heavy. Perhaps the duty has weighed most heavily upon the employer where the seaman is injured or becomes ill at sea and is dependent upon his ship in a most compelling sense for treatment and care. In this situation, the following language of the Supreme Court of the United States in The Iroquois, 194 U.S. 240, 24 S.Ct. 640, 643, 48 L.Ed. 955, is perhaps as strong a statement by a court of authority as will be found:

"We lay no stress upon the fact that the libellant did not ask to be taken into an intermediate port. He was a boy, largely ig-

norant of his rights and duties. The master was his legal guardian in the sense that it is a part of his duty to look out for the safety and care of his seamen, whether they make a distinct request for it or not."

. Seamen are quite commonly referred to as the wards of the Admiralty, and this statement is strictly true in so far as the Admiralty has retained and has exercised the power to determine whether the seaman has been properly dealt with by his employer in making compromises and settlements. See Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L. Ed. 244. Nevertheless, seaman and employer have the right to bargain as between themselves. The seaman can compromise a claim against his employer and can discharge it by release in his employer's favor. Releases by seamen have been upheld where the court was satisfied that the seaman knew what he was doing and appreciated the effect of his act. The Topsy, D.C., 44 F. 631; De Lisi v. Booth & Co., D.C., 271 F. 47; Pfeil v. United States, 2 Cir., 34 F.2d 923; Harmon v. United States, 5 Cir., 59 F.2d 372; McKenney v. Swayne & Hoyt, 5 Cir., 104 F.2d 20; Ames v. American Export Lines, D.C., 41 F. Supp. 930. In such cases the fact that the consideration paid the seaman is less than a jury might have awarded him, or is less than other persons thought he should accept, has not constituted a ground for rescinding the release. See Sitchon v. American Export Lines, 2 Cir., 113 F.2d 830, in addition to cases just cited. Bonici v. Standard Oil Co., 2 Cir., 103 F.2d 437, is not to the contrary, but is primarily a case of nonfraudulent misrepresentation by the employer. It seems, in fact, that what might be termed an inadequacy of consideration for a seaman's release is to be considered only as evidence bearing on whether the seaman knew and appreciated what he was doing. Garrett v. Moore-McCormack Co., supra. That the seaman was suffering from a serious illness in the case at bar does not affect the matter; we have seen nothing to indicate that a case of serious injury might not be the subject of compromise and settlement precisely as are cases of slight injury. We do not understand that the Admiralty has limited the contractual capacity of either seaman or employer. Such capacity exists and is recognized, and the Admiralty is only concerned with the seaman's understanding of the transaction and the reality of his consent. There was nothing in the relation between the defendant and the seaman here to prevent their entering into a compromise and settlement of the seaman's claim for maintenance and cure. The particular settlement in evidence is not shown to be unconscionable on its face. The parties have stipulated that if called, a doctor would testify that "the reasonable cost of maintenance in a hospital for care of tubercular patients ten and a half months would be $1,050.00, or $100.00 a month," and the finding of the jury is in accord. On this record the sum paid the seaman by defendant would have provided five months' hospitalization. Under Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993, the defendant was not liable for maintenance and care beyond the time when treatment would actually improve the seaman's condition; and the evidence in this case does not establish as a matter of law that the five months for which the $525.00 would have paid was less than defendant's full responsibility.

 The finding in response to special issue No. 10 is to be given full effect despite the finding of negligence in response to special issue No. 4. While issue No. 4 appears to be in specific terms, it actually covered more than one question of fact as previous discussion indicates. Galveston, H. & S. A. R. Co. v. Price, Tex.Com.App., 240 S.W. 524.

 The effect of the jury's answer to special issue No. 8 remains to be considered. The jury found that the seaman did not understand "that the document signed by him in New York was in full and complete settlement of any and all claims." This finding is ambiguous. The seaman actually signed three documents on June 4, 1942, namely, a formal release, a cash voucher bearing words of release, and a statement. We have not previously referred to the statement and it need not be discussed. All three instruments were alleged and proven by the defendant. The question on the facts was whether the seaman mistook the character or effect of the release and voucher and not whether he understood that he was settling any and all claims. However, a construction of the pleadings and the evidence suggests that the document referred to in the issue is the one referred to by the seaman when he said he "signed" for his pay (or is, perhaps, the release), and the finding that he did not understand he was settling "any and all

claims" amounts to a finding that he did not understand he was settling his claim for maintenance and cure. So construed, the jury would have found that the seaman mistook the character of the document he signed, and a question is raised, whether the release would stand. However, this presents a unilateral mistake and no more; it does not impeach defendant's good faith in procuring the release, and such good faith was established by the finding in response to special issue No. 10, namely, that the "release offered in evidence was executed freely without deception or coercion." It was this good faith which obviated further performance of the duty to provide the seaman with maintenance and cure, at least down to the time that demand was made on the defendant for further performance.

It is nowhere shown that demand was made on the defendant prior to the filing of this suit. The transcript does not exhibit the date when the original petition was filed, but this presumably was at some time in 1943, not long before defendant filed answer, on March 26, 1943. The seaman was then in the Jefferson County Tuberculosis Hospital; he had entered that hospital on the preceding October 26th, and remained under treatment therein until his death in April, 1943. On the findings of the jury the defendant has thus been acquitted of any negligence after the settlement transaction of June 4th. If the release was taken in good faith, plaintiffs have made no effort to show that defendant's reliance thereon was wrongful.

■ (4) We also hold that plaintiffs have not proved that any negligence of defendant in failing to furnish hospitalization and treatment to the seaman after June 4, 1942, was a proximate cause of any aggravation or acceleration of the seaman's disease. To raise the issue of proximate cause, plaintiffs had to show that the seaman failed to get something which should have been provided by defendant and for all this record shows the seaman never lacked for anything.

It must be kept in mind that as respects the alleged cause of action for damages for injuries resulting from negligence, as contrasted with the cause of action to recover an outlay for expenses paid, the seaman was bound to exercise care for his own welfare and to expend his own funds or make use of other means apparent, open and available to him wherewith to procure treatment and hospitalization for himself; and any injury resulting from his failure so to do was wholly a result of his own lack of care. The principle is sufficiently indicated by the following quotation from Cortes v. Baltimore Insular Lines, 287 U.S. 367, 53 S.Ct. 173, 175, 77 L.Ed. 368: "The failure to provide maintenance or cure may be a personal injury or something else according to the consequences. If the seaman has been able to procure his maintenance and cure out of his own or his friends' money, his remedy is for the outlay, but personal injury there is none." If the expenditure of the seaman's funds results in no personal injury to him under the Jones Act (which was before the court in the Cortes case), then the seaman's failure to use his funds or equivalent means cannot have any greater effect, for if it did the seaman could capitalize on his own negligent disregard for his welfare. In The Pochasset, 1 Cir., 295 F. 6, 10, the court refused to order an operation or award other than medical expense incurred, for one reason: "(2) Because the evidence leaves us in grave doubt as to whether the (seaman's) condition is not, at least in large part, his own fault, due to his unruly interference with the bandages upon the limbs, and his refusal to remain quiet in order to give the fractured bone an opportunity to knit." Also see the cases referred to below, respecting lapse of the employer's duty upon the seaman's refusal, express or implied, to take advantage of treatment made available to him by the employer.

■ The seaman unquestionably learned in Aruba that he was ill, that he ought to rest and that cure might require a long time. As stated, he testified that "the only thing (the Aruba physician) told me, he says I ought to rest for a year and I would be all right." The jury found that he was advised before reaching New York that he had tuberculosis, moderately advanced, although he said the Aruba doctor told him he had pleurisy, that it could be tuberculosis but the doctor did not believe so. The seaman's entire course of conduct after leaving New York indicates that he knew he was ill and required treatment of some character. These statements are made with due appreciation of the jury's answer to special issue No. 12. That issue read:

"Do you find from the preponderance of the evidence that upon leaving New York,

Karis Premeaux knew that he had pulmonary tuberculosis, moderately advanced, and that in order to arrest the disease his condition would require months of treatment, and that so knowing he failed to apply for extended treatment until October 26th, 1942?

"Answer 'He did so fail to apply' or 'He did not so fail to apply.'"

The jury found: "He did not so fail to apply." This issue submitted three questions for one answer and did not assume that the seaman had failed to apply for extended treatment until October 26th. The finding can rest upon a negative answer to any one of the three questions and is not necessarily inconsistent with what we have said the seaman knew. Construed in relation to the entire charge, as it must be, it is not in conflict with the immediate preceding answer to special issue No. 11, namely, that the seaman was advised before reaching New York he had pulmonary tuberculosis, moderately advanced.

With the foregoing in mind, it must be pointed out that the evidence fails to account for the expenditure of the $525. The seaman may have spent it for many necessary things but what it was spent for, if at all, does not clearly appear. There is some indication that a part of it may have been given to his family but this has not been adequately developed. This sum, on the stipulation and finding respecting medical costs to which we have previously referred, would have provided hospitalization for five months, that is from June 4th to November 4, 1942, and would have covered the entire period from the settlement transaction until the seaman entered the Jefferson County Tuberculosis Hospital where he remained until his death. If the seaman had spent this money for the five months of treatment which the parties thought it would have procured, his disease might have been arrested or his condition very greatly improved.

However, the seaman undertook other methods of cure. The testimony as to his movements after June 4, 1942, and prior to his entry into the Jefferson County Tuberculosis Hospital on October 26, 1942, comes from him and his father and is without material conflict so far as his movements are concerned. It shows that the seaman left New York for his home in Nederland a few hours after the settlement transaction of June 4th, and that about four days were required for the trip. He remained at home about three or four weeks. His father says that during this time he did not work, that he "stay most of the time at home and rest, go to town a while and come back to the house and rest." The seaman said he had to go to bed when he got home and was in bed "all the time I was here." At the end of this period, the seaman secured employment as messman on board the ship W. W. Mills and made a voyage of about six days. He said he did this to obtain a certificate of discharge, whereby to enter a marine hospital. He also said that: "I only had two men to feed. There wasn't no work to it." He left that ship at Mobile, returned to his home via bus, and immediately or very shortly thereafter entered the marine hospital at Galveston where his condition was diagnosed as tubercular. He remained in this hospital for about a week or ten days and said that they sent him to the marine hospital at Chicago, "they don't handle no tubercular patients at Galveston." He entered the marine hospital at Chicago and as we construe his testimony remained there a week. His father said he stayed in the Chicago hospital and was there about three weeks. We take the following extract from his testimony: "What took place in Chicago? They sent you to another hospital? A. Well, they found t. b. in Galveston. When I got to Chicago three days later they found that one of my lungs was full of t. b. and the other half full."

He returned home after leaving the Chicago hospital, went to bed and apparently received some treatment from a Nederland doctor, and after an indeterminate period, was placed in the Jefferson County Tuberculosis Hospital as the result of his father's efforts. It is not clear whether the seaman returned to Nederland immediately after he left the Chicago hospital and it is not clear how long he remained at home before he entered the Jefferson County Tuberculosis Hospital. He must have left the Chicago hospital in July and did not enter the Jefferson County Hospital until October 26th.

No reason has been adduced for leaving the Chicago hospital. Means of treatment must have been available to him there because he says he was sent there from the Galveston hospital. After he obtained his certificate of discharge from the W. W. Mills, he seems to have had no trouble receiving treatment from the marine hospital service and there is no tes-

timony indicating that these hospitals made any charge for their services. None of their records were adduced, and no one connected with them testified. The seaman said that "you have got to have" a discharge to "get in a hospital," and that he made his trip on the W. W. Mills to obtain a discharge in order that he could be admitted to a marine hospital. The only other witness whose testimony covered this matter was Capt. Frank Girrardeau, a ship master. He said that on being discharged a seaman was entitled to a certificate of discharge, that on an American flag vessel this certificate was the open sesame to him to a marine hospital, that on an American flag vessel he gets into a marine hospital on his discharge, and that he can be admitted without a discharge if he has a master's certificate, but must have one or the other. The marine hospitals to which these witnesses refer were evidently the hospitals maintained prior to the Act of July 1, 1944, 42 U.S.C.A. § 201, et seq., § 249, by the Public Health and Marine Hospital-Service Act, 42 U.S.C.A. §§ 1, 6; 24 U.S.C.A. §§ 1, 11, 26, et seq., which was charged with providing "care of sick and disabled seamen and all other duties formerly required by law to be performed by the Marine Hospital Service." 42 U.S.C.A. § 6. The seamen themselves originally made some contribution to the marine hospital fund (Holt v. Cummings, 102 Pa. 212, 48 Am.St.Rep. 199), but for many years appropriations for the support of the service have been made by the United States government (notes to 42 U.S.C.A. 6, and 24 U.S.C.A. § 26. Courts take judicial notice of the Marine Hospital Service. The Bouker, No. 2, 2 Cir., 241 F. 831. As said in Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 654, 82 L.Ed. 993: "Moreover, courts take cognizance of the marine hospital service where seamen may be treated at minimum expense, in some cases without expense, and they limit recovery to the expense of such maintenance and cure as is not at the disposal of the seaman through recourse to that service." Many cases throughout the reports show free treatment of American seamen by this service over varying periods, sometimes long periods, both where the opinions show admission on master's certificate and where the particular means of admission are not referred to. See The Saguache, 2 Cir., 112 F.2d 482. It is presently the rule that where the seaman is tendered a marine hospital certificate, his refusal thereof relieves the employer of an obligation to provide additional maintenance and cure. June v. Pan-American Pet. T. Co., 5 Cir., 25 F.2d 457; Marshall v. International M. M. Co., 2 Cir., 39 F.2d 551; The Balsa, 3 Cir., 10 F.2d 408; The Natchez, 5 Cir., 73 F. 267; as is true where, having entered the marine hospital, the seaman leaves voluntarily and without what might be called justification, The Santa Barbara, 2 Cir., 263 F. 369; Stokes v. United States, D.C., 55 F.Supp. 56, affirmed 2 Cir., 144 F.2d 82; Bailey v. City of New York, D.C., 55 F.Supp. 699; or is discharged from the hospital for disciplinary reasons. The Saguache, supra.

We think the evidence shows prima facie that the seaman here obtained by his own efforts, as of the date he entered the Galveston hospital, what the defendant could have tendered him and all that the defendant was required to tender him, and that the seaman's failure to give any reason for his leaving the Chicago hospital put him in the position of a seaman who rejects a tendered hospital certificate, or having accepted it and entered the hospital, leaves for insufficient grounds. If voluntary abandonment of the marine hospital service was not given such effect, the seaman, as we have pointed out above in another connection, might capitalize on his disregard for his own welfare. These remarks are in accord with the quotation above from Calmar Steamship Corp. v. Taylor. They must be limited to the cause of action for damages for negligence in not providing maintenance and cure and do not apply to a cause of action for the outlay for medical expenses. See The Bouker No. 2, 2 Cir., 241 F. 831.

Since plaintiffs have shown no reason for the seaman's leaving the Chicago hospital, they have in effect relieved the defendant as a matter of law of liability from failure to provide maintenance and cure between the time the seaman left the Chicago hospital and entered the Jefferson County Tuberculosis Hospital. Of course, after the entry into the Jefferson County Hospital, the seaman received adequate hospitalization and treatment and any failure on the part of the defendant was without operative effect; and nothing less can be said of the period the seaman spent in the Galveston and Chicago marine hospitals. The only time remaining when defendant's asserted negligence could have operated was thus the period covered by the seaman's trip home from New York, the three or

four weeks thereafter and the six day voyage aboard the W. W. Mills, and without some definite evidence as to what happened to the $525.00 and why the seaman followed the course he did it cannot be said that defendant is responsible for the seaman not having received treatment during this time.

In order for the plaintiffs to show that defendant's failure to furnish hospitalization and treatment to the seaman was a proximate cause of his injury, the plaintiffs, as previously stated, were required in the first instance to prove that the seaman was unable to procure such hospitalization, treatment and medical advice as he actually needed, and they have failed to do so. Plaintiffs have not proven a single expenditure, for treatment or otherwise, and they have failed to prove that the seaman was unable to make any necessary expenditures. The seaman was at home for some time after June 4th but no expenditure or liability for maintenance was proven. A doctor visited him an indeterminate number of times but no charge by or payment to him was proven. It is not shown that any charge by or payment to the Jefferson County Tuberculosis Hospital was made, and this is likewise true of the marine hospitals. Doubtless the seaman paid bus fare from New York and from Mobile and train fare between Galveston and Chicago and we infer that he was at some expense in returning from Chicago to Nederland, but no one has said so and no one has said what the charges were. Presumably all of these matters could have been proven. We have had some inclination to infer that the seaman came home from New York believing he needed treatment which he could not pay for, that he knew of the marine hospital service and concluded to enter such a hospital, that he spent the three or four weeks at home resting and waiting on a ship, and that he took employment on the W. W. Mills to secure the certificate of discharge which he thought necessary for his purpose. However, the seaman's motives have not been proven (nor why, if this was his plan, he did not seek aid from his employer) although they could have been. There is little room for inference when testimony is available from people who best know the facts and who could have testified had they desired.

(5) The foregoing not only disposes of plaintiffs' claim for damages for personal injuries but also disposes of plaintiffs' claim for medical expenses. The plaintiffs' cause of action was based on the Jones Act, the gist of their suit was negligence, and, negligence and proximate cause not having been established, the entire cause of action falls, not only the item for personal injuries but also the item for incidental expenses. The seaman's cause of action for outlay under the general maritime law, if it survived, which we do not determine, is not before us for at least the reason that recovery thereon was limited in the first instance to actual cost, and neither pleading, proof nor verdict show cost. The stipulation that a doctor would testify "that the reasonable cost of maintenance in a hospital for care of tubercular patients ten and a half months would be $1,050.00, or $100.-00 per month," and the finding in response to special issue No. 7 that the "fair and reasonable cost of hospitalization and medical treatment of (the seaman) between May 20, 1942, and the date of his death on April 14, 1943," would be $1,050 will not support a recovery on this cause of action. Robinson v. Swayne & Hoyt, Ltd., D.C., 33 F. Supp. 93. It is not inappropriate to point out that the stipulation and the finding have no relation to the facts of this case.

(6) Disposition of this appeal is controlled by the first paragraph of Rule 434, Texas Rules of Civil Procedure. There is no matter of fact to be ascertained, nor is there uncertainty in any matter to be cleared. Although the parties may not have given the same significance to some of the jury findings and to some of the evidence that we have, a remand would not affect the basic theory of the plaintiffs. We do not think this is an instance of trial on an incorrect theory as regards the claim for damages for injuries. If the claim for hospitalization and treatment was tried on an incorrect theory, the item could have been sued for as an element of consequential damages (Van Camp Sea Food Co. v. Nordyke, 9 Cir., 140 F.2d 902); the parties evidently so treated it, and we have done the same. The judgment of the trial court is therefore reversed and judgment is here rendered for appellant.