George HOPSON, Appellee,

v.

TEXACO, INC., Appellant.

Rebecca B. REYNOLDS, Administratrix of the Estate of Frederick Clement Reynolds, Deceased, Appellee,

v.

TEXACO, INC., Appellant.

Nos. 9668, 9669.

United States Court of Appeals Fourth Circuit.

Argued Feb. 2, 1965.

Decided Sept. 15, 1965.

Harry E. McCoy, Norfolk, Va. (Seawell, McCoy, Winston & Dalton, Norfolk, Va., on brief), for appellant.

C. Arthur Rutter, Jr., Norfolk, Va., (Amato, Babalas, Breit, Cohen, Rutter & Friedman, Norfolk, Va., on brief), for appellees.

Before SOBELOFF, BOREMAN and BRYAN, Circuit Judges.

BOREMAN, Circuit Judge:

These actions were brought under the Jones Act (46 U.S.C.A. § 688) to recover damages for personal injuries to a seaman and for the death of another as a result of an automobile accident on the Island of Trinidad. Verdicts and judgments were rendered against Texaco, Inc., in favor of the injured George Hopson and Rebecca Reynolds, the widow and personal representative of the deceased Frederick Reynolds. From these judgments Texaco appeals.

The facts are not in dispute. George Hopson and Frederick Reynolds were American seamen employed by Texaco aboard its ship, the S. S. Texaco Wisconsin, a large tanker engaged in transporting bulk petroleum products to various ports. On April 17, 1963, the Wisconsin was at Pointe-a-Pierre on the Island of Trinidad to take on a cargo of fuel at the Texaco-Trinidad corporation refinery which was a wholly owned subsidiary of Texaco and acted as the husbanding agent for the Wisconsin while it was in Trinidad. During the loading of the vessel, Hopson and Reynolds became ill and it became necessary to repatriate them rather than have them continue as crewmen on the Wisconsin and make the forthcoming voyage with the cargo of fuel to San Diego, California, via the Panama Canal. To effect the repatriation according to applicable statutes, the Master of the Wisconsin and the seamen had to appear before a United States Consul where the seamen would be officially discharged and paid their wages. The United States Consul's office was located in Port-of-Spain, thirty-eight miles north of Pointe-a-Pierre. To arrange transportation to Port-of-Spain, the Master of the Wisconsin contacted Texaco-Trinidad. As was customary when business was to be transacted outside the confines of the refinery, Texaco-Trinidad telephoned John Abhiram's Taxi Service and requested a taxi. This taxi company, duly licensed by the Trinidad government, was one of two local companies used by Texaco-Trinidad for such purposes. Rambally Abhiram, a brother of the taxi company's owner and licensed to work as a taxi driver, was sent to take the Master, Hopson, and Reynolds to Port-of-Spain.

Between Pointe-a-Pierre and Port-of-Spain, the taxi collided with a truck. As a result of the collision, the Master and Reynolds were killed, Hopson and the taxi driver were seriously injured. In July 1963 Hopson and the personal representative of Reynolds instituted separate actions against Texaco. In their respective complaints they alleged that Rambally Abhiram's negligent operation of the taxi was the proximate cause of the accident and resulting injuries and death and that Texaco was liable for his negligence since the driver was, in fact, Texaco's agent. The cases were consolidated for trial in the lower court.

At the close of all the evidence, Texaco moved for a directed verdict. Texaco's position was that the taxi driver was an independent contractor, not an agent, and Texaco was not responsible for any negligence of the taxi driver as long as it had exercised reasonable care in selecting the taxi company and there was no evidence to show that it had failed in this respect. The District Court denied the motion and held as a matter of law that Texaco was liable for any negligence on the part of the taxi driver which contributed to the accident. The court's ruling was based on three theories, any one of which the court deemed sufficient to impose liability on Texaco: (1) the taxi driver was an "agent" of Texaco within the meaning of that term as used in the Federal Employers' Liability Act (herein called FELA); (2) Texaco owed a nondelegable duty to provide reasonably safe facilities for the seamen to use in the course of their employment; and (3) the contract with the taxi company was void under 45 U.S.C.A. § 55. The cases were then submitted to the jury on the issues of the taxi driver's negligence and damages. The jury concluded, based on facts and circumstances surrounding the accident which are not material to this appeal, that the taxi driver was negligent and awarded damages of $75,000 to the widow and dependents of Reynolds and of $45,000 to Hopson.

In this appeal, Texaco does not contest the jury's finding that the taxi driver was negligent or the amount of damages. Further, it concedes that Hopson and Reynolds were acting in the course of their employment within the terms of the Jones Act (46 U.S.C.A. 688) when the accident occurred. The thrust of its argument is that the District Court erred in holding as a matter of law that Texaco was responsible for the taxi driver's negligence on any of the three theories.

■ Under general maritime law a seaman could only recover against a ship or its owner for personal injuries suffered in line of service when there had been a breach of the duty to provide a seaworthy ship or to provide him with maintenance and cure. The Jones Act, under which the present suits were brought, gave to seamen or their personal representatives a cause of action against their employer based on negligence. Cortes v. Baltimore Insular Line, Inc., 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368 (1932). By reference, the Jones Act incorporated the standards of the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–60, for determining the employer's liability. Under section 1 of the FELA, 45 U.S.C.A. § 51, a railroad is liable to its employees for injuries or death resulting in whole or in part from the negligence of any officers, agents, or employees of such railroad. Other sections of FELA, not material here, abrogate or modify the common law defenses of the fellow servant rule, assumption of risk, and contributory negligence.

The first theory relied on by the District Court to hold Texaco responsible for the taxi driver's negligence was that the taxi driver was an "agent" of Texaco within the meaning of section 1 of the FELA. That section does not define the term "agents." Of course, if the taxi driver was an agent under common law principles, he would be an agent for the purposes of the FELA also. However, the court ruled as a matter of law that the taxi driver was an agent and it is clear from the record that the court's ruling was not based on common law principles, but primarily upon the decision in Sinkler v. Missouri Pacific R. Co., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958). The court concluded that the taxi driver was an "agent" because in transporting the seamen to the U.S. Consul's office to be repatriated, he was performing an "operational activity" of Texaco.[1]

1. Statements by the court would seem to negate any possibility that it relied on common law principles. It stated:

"The taxi cab which the official of Texaco-Trinidad Corporation called was not owned or controlled by the Texaco-Trinidad Corporation or the Texaco Company."

The court added:

The Sinkler case established new concepts to be used in determining who is an "agent" under the FELA. But we do not think that decision can be interpreted to mean that every independent contractor who performs some function incident to the business of railroading or shipping is an agent of the railroad or ship. There, the plaintiff was employed by the Missouri Pacific Railroad as a cook in the private car of Missouri Pacific's general manager. Belt Railway was under contract with Missouri Pacific to perform all the switching operations in Union Station at Houston, Texas. Belt had been organized by Missouri Pacific and other common carriers for that specific purpose and had been performing all the switching operations since 1905.[2] On the day of the accident, Belt's switching crew undertook to move the car in which Sinkler was working from one track to another. Through negligent fault of the switching crew, the car violently collided with another car and plaintiff was injured. In holding that Missouri Pacific was liable for the negligence of Belt's employees, the Court did not base its decision upon consideration and application of common law principles of agency. Instead, the Court elected to base its decision upon what it found to be the broad congressional purpose behind the legislation and the nature of the service performed by Belt's employees. The purpose was stated as follows:

"* * * This statute, an avowed departure from the rules of the common law * * * was a response to the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety. * * * The cost

of human injury, an inescapable expense of railroading, must be borne by someone, and the FELA seeks to adjust that expense equitably between the worker and the carrier. * * * [I]t was the conception of this legislation that the railroad was a unitary enterprise, its economic resources obligated to bear the burden of all injuries befalling those engaged in the enterprise arising out of the fault of any other member engaged in the common endeavor. * * *" 356 U.S. at pp. 329–330, 78 S.Ct. at p. 762.

The Court said:

"* * * Switching is a vital operational activity of railroading consisting in the breaking up and assembly of trains and the handling of cars in interchange with other carriers. This function, in the Houston area, had been contracted by the respondent and its predecessors, and other carriers, to the Belt Railway, a carrier specially organized for that purpose." 356 U.S. at p. 327, 78 S.Ct. at p. 760.

In considering this appeal, it is necessary that we determine the intended meaning of the Supreme Court in its use of the phrase "operational activities." The language used by the Court in that connection is most helpful:

"In the present case the respondent [Missouri Pacific], rather than doing the *necessary* switching incident to its business in the Houston Terminal area, arranged that the Belt Railway should supply the crews and equipment to perform this operation on its behalf. But the evidence clearly establishes that the

"The Court is of the opinion that the decision in Sinkler v. Missouri Pacific R. R. Co., 356 U.S. 326 [78 S.Ct. 758, 2 L.Ed.2d 799] (1958), controls the motion before this Court."

2. Based on these and subsidiary facts, the jury in the lower court had found that Belt Railway was under the control and supervision of the Missouri Pacific. The state appellate court had reversed

this finding as not supported by the evidence. The Supreme Court apparently disregarded it also in reaching its conclusion. See 356 U.S. at p. 331, 78 S.Ct. at 762 and footnote 2 of the dissenting opinion, 356 U.S. at p. 333, 78 S.Ct. at p. 763. Also, in Ward v. Atlantic Coast Line R. Co., 362 U.S. 396, 397, 80 S.Ct. 789, 4 L. Ed.2d 820 (1960), the Court stated Belt was an independent contractor.

respondent's trains, when under the control of the Belt Railway's switching crews, were being handled to *further the task of the respondent's enterprise.* While engaged in switching and handling respondent's cars and trains about the terminal area, the Belt Railway employees on the job were, for purposes of the FELA, as much *a part of the respondent's total enterprise* as was the petitioner while engaged in his regular work on the respondent's car." 356 U.S. at 331, 78 S.Ct. at 762. (Emphasis added.)

The Court concluded by stating at page 331:

" * * * We therefore hold that when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, *operational activities* of his employer, such others are 'agents' of the employer within the meaning of § 1 of FELA." 356 U.S. at 331 and 332, 78 S.Ct. at 763. (Emphasis added.)

From the opinion in Sinkler, it is clear that plaintiff's injury was a result of a risk connected with railroading and one which FELA was designed to cover. Moreover, at the time he was injured, plaintiff was actually performing the job for which he had been employed and the injury he sustained was a direct result of the negligence of another railroad's employees who were engaged in a common endeavor without the services of which Missouri Pacific could not have operated its trains. More recently, the Court has referred to and described the factual situation in Sinkler as one in which the railroad engaged an independent contractor to perform "operational activities" *required to carry out the franchise.* Ward v. Atlantic Coast Line R. Co., 362 U.S. 396, 397, 80 S.Ct. 789, 4 L.Ed.2d 820 (1960). One court has stated that it is crucial in applying the Sinkler formula that the railroad actually be performing activities necessary to carry out the franchise. Mazzucola v. Pennsylvania R. R. Co., 281 F.2d 267 (3 Cir. 1960), footnote 4, at page 270.

Applying the guideline principles announced by the Court in Sinkler to the present case and giving the word "agents" an accommodating scope as we feel compelled to do, we do not think the services performed by the taxi company can be called an "operational activity" of Texaco. The nature and regularity of the taxi services rendered are completely different from the services rendered by Belt Railway in Sinkler. The taxi company was one of two local companies which Texaco-Trinidad occasionally used for performing business errands outside the area of the refinery. While the evidence revealed that the taxi company made on the average of two or three trips a week to various places on the Island, most of these trips were for the purpose of taking documents to the U. S. Consul's office or other places in which case the taxi driver himself delivered the documents. Obviously, few trips would be made for the purpose of repatriating seamen. The service rendered was not, in itself, a part of Texaco's business of transporting petroleum products to various ports or of operating the tanker Wisconsin. The taxi driver was not performing the same type of work as the seamen and his work had no direct connection with the shipping business. In short, the taxi company was not a part of Texaco's enterprise; the service performed by it was simply a collateral activity which had nothing to do with the actual operation of a ship.

Two subsequent decisions hereinafter mentioned in which the Sinkler doctrine was applied may appear to support a conclusion contrary to ours as stated above. Carney v. Pittsburgh & Lake Erie R. R. Co., 316 F.2d 277 (3 Cir. 1963), one judge dissenting, cert. denied 375 U.S. 814, 84 S.Ct. 45, 11 L.Ed.2d 49; Leek v. Baltimore & Ohio R. R. Co., 200 F.Supp. 368 (N.D.W.Va. 1962). Admittedly, those cases held certain services performed by independent contractors to be "operational activities" of railroading that tend to extend the Sinkler doctrine. But even in

those cases, the frequency and nature of the services rendered differ from the case at bar. In Leek the cab company was hired by the railroad to shuttle train crews between the place where the crews signed in and reported for work and the place where the work was performed. The taxicab would pick up crews ready to begin work and take them to the place of operations. There, it would pick up the crews that were being relieved and transport them back to the check-out point. This shuttling service was provided at the beginning of every shift during each day and had continued over a period of several years. The court, in holding that the cab company was performing an "operational activity," stated at page 371:

> " * * * This is the day after day, week after week, contract carriage of groups of employees, on company time, between fixed points. It is an integral and continuing part of the railroad's total operations. * * * "

In Carney, 316 F.2d 277, the railroad had transferred several of its employees to a town in Ohio for the purpose of constructing a special project. It arranged for Carney and his fellow workers to stay at the Pittsburgh & Lake Erie Railroad Y.M.C.A. Carney and the other workers slept at the Y.M.C.A. during the work week, ate two meals a day at its restaurant, and had their lunches packed by Y.M.C.A. employees. This routine had been followed for several months prior to the accident in which Carney was injured when he fell from a negligently maintained bed in the Y.M.C.A. The court concluded that the Y.M.C.A. was performing operational activities for the railroad. It stated at page 281:

> "What we have here is that the lodging of Carney at the railroad Y.M.C.A. was an integral part of the Pittsburgh & Lake Erie's particular

and important project in the vicinity. By that means the railroad made sure that Carney was on location and readily available during the period of the Campbell undertaking. The railroad handled Carney's board and lodging through the Y.M.C.A. ' * * to further the task of [its] enterprise.' And it was just as much a part of that enterprise as when Carney was actually stringing cable, for it put him in Campbell and kept him there to do that phase of the work. * * * In this instance it was solely Pittsburgh & Lake Erie construction, alterations or repairs which were involved and for which his employer wanted Carney to be and remain at the scene. * * * "

Obviously, the railroad benefited from Carney's presence and the service rendered by the Y.M.C.A. was a continuing part of the railroad's over-all operation at the project.[3]

In two cases factually similar to the case at bar but decided before Sinkler, the courts held that a shipowner was not liable to seamen injured by the negligence of an independent contractor hired by their employer in the absence of a showing that the shipowners had negligently selected an improper or incompetent contractor. McCall v. Overseas Tankship Corp., 222 F.2d 441 (2 Cir. 1955); Premeaux v. Socony-Vacuum Oil Co., 187 S.W.2d 690 (Tex.Civ.App.1945). In McCall the contractor had been hired by the employer to transport, by plane, the crew of a tanker from the Far East to New York. While making the trip the contractor's plane crashed and McCall was killed. The court stated, 222 F.2d at page 444:

> "Even if it be assumed arguendo that McCall continued in the employ of Overseas during his flight home, its contractual duty to 'arrange

3. Our attention has been directed to a California case, Mangrum v. Union Pacific Railroad Company, 230 Cal.App.2d 960, 41 Cal.Rptr. 536 (December 1964) in which a physician who was called by the railroad to attend a sick dining car employee was held to be an agent of the railroad under the expanded doctrine of Sinkler. But, insofar as that case held the service of the physician to be an "occupational activity" of the railroad and that the physician was an agent of the railroad, we do not find it even slightly persuasive.

transportation' did not make it an insurer of his safety en route. Its duty was to exercise ordinary and reasonable care in selecting the carrier. There is no suggestion that it failed to do so."

Judge L. Hand, in a concurring opinion, agreed that Overseas was not liable. He stated:

"Since we are all agreed that the airplane company was an independent contractor, whose negligence is not to be imputed to the defendant, it is not necessary to decide whether McCall was still in the employment of the defendant * * *." 222 F. 2d at 445.

In the Socony-Vacuum case, plaintiff's decedent was employed as a seaman aboard Socony's ship. While the ship was on a voyage in the Caribbean Sea, he became ill and had to be repatriated. Socony arranged transportation for him aboard another vessel returning to the United States. Some little time after he had returned to the States, he died from his illness. His personal representative brought an action under the Jones Act against Socony, alleging that Socony was liable for its failure to provide maintenance and cure. Part of the claim was based on a specific allegation that the deceased had not received proper medical treatment on board the vessel which Socony had hired to transport him to the United States. In regard to this part of the claim, the court stated:

"The Jones Act, by referring to and adopting relevant portions of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., which makes the employer liable for the negligence of his officers, agents, and employees, may have enlarged the employer's liability in some instances * * *, but not where an independent agency has been employed. An independent contractor is not an officer, agent or employee within the meaning of the Federal Employers' Liability Act, at least, where the employer's duty is not absolute. * * *" 187 S.W.2d at 698.

While McCall and Premeaux must be read in light of the later Sinkler decision, for reasons hereinbefore assigned, we do not think that Sinkler would compel a different result in those two cases. We are not persuaded that the repatriation of a seaman is an "operational activity" within the meaning of the phrase as used in Sinkler. Consequently, we hold that the District Court erred in deciding as a matter of law that the taxi driver was an agent of Texaco and in so instructing the jury.

The second point made by the District Court was that an employer "owed a nondelegable duty to provide reasonably safe facilities that his employee must use in the course of his employment." The court was announcing orally from the bench its ruling on the defendant's motion for a directed verdict, but made no explanation of its reasoning and cited no authority in support of this stated conclusion. No written opinion was filed. The court had earlier stated that at the time of the accident the two seamen riding in the taxi were in the employment of Texaco and "they were seamen on the ship, the TEXACO WISCONSIN." The plaintiffs and defendant, in main briefs and argument, seem to construe the court's pronouncement as a reference to the employer's duty to provide the employees with a safe place in which to work and to furnish safe equipment, appliances, instrumentalities, and "facilities" to be used in the performance of their work.

We start with the basic premise that Texaco had a duty to exercise reasonable care to provide a safe place for the seamen to work and to provide them with reasonably safe "facilities" (to adopt the catch-all word used by the court below) for use by the employees in the performance of their work. Possibly the District Court was relying on Mr. Justice Clark's concurring opinion of less than four lines in the Sinkler case:

"* * * for purposes of the FELA, the Belt Railway was performing a nondelegable duty of respondent's at the time of petitioner's

injury." 356 U.S. at p. 332, 78 S.Ct. at p. 763.

█ But the duty under the FELA to furnish a safe place to work is not *absolute* and thus an employer is not an insurer of his employee's safety;[4] that duty is to exercise *reasonable care* to provide employees with a safe place in which to work.[5] The employer is not an insurer of any of the tools or instrumentalities with which the employee is required to work [6] but is liable for any defects or insufficiencies therein if attributable to the employer's negligence.[7] When the cause of action is based on the Jones Act, negligence concepts are applicable and the shipowner is required only to exercise reasonable care to provide employees a safe place to work and safe appliances;[8] that duty is not *absolute* as held and recognized to be in causes of action based solely on unseaworthiness. Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

Here, Texaco was under the legal duty to repatriate these ill seamen in the discharge of its obligation to provide proper maintenance and cure; it was undoubtedly also a contractual duty by virtue of the ship's articles and company-union contracts. The duty to repatriate was recognized by Texaco; the seamen were to be returned as soon as possible to America; they and the ship were in a distant part of the world. The plan, unquestionably reasonable under the circumstances, was to provide the seamen's transportation for a distance of thirty-eight miles by motor vehicle and then by plane to their destination. The Supreme Court has stated:

" * * * Congress [by enacting the FELA and the Jones Act] did not mean that the standards of legal duty must be the same by land and sea. Congress meant no more than this, that the duty must be legal, i. e., imposed by law; that it shall have been imposed for the benefit of the seaman, and for the promotion of his health or safety; and that the negligent omission to fulfill it shall have resulted in damage to his person. * * * " Cortes v. Baltimore Insular Line, Inc., 287 U.S. 367, 377–378, 53 S.Ct. 173, 177, 77 L.Ed. 368 (1932).

█ This court will take judicial notice of the fact that it is virtually impossible for a shipowner to carry its own shore-side means of transportation from one port to another or for it to own, operate, or control shore-side transportation facilities in every port and every part of the world. It would be unreasonable to require or expect a shipowner to do so. The *performance* by the shipowner of the duty and obligation to repatriate seamen, whose vessel is then located in a far distant port must, of necessity, be delegated to independent carriers. The rule of reason and logic requires no more than that the selection of the carrier shall not be negligently made.

█ These seamen were still in the "course of their employment" when the

---

4. Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1949); Chesapeake & Ohio Ry. Co. v. Thomas, 198 F.2d 783 (4 Cir. 1952); Atlantic Coast Line R. Co. v. Craven, 185 F.2d 176 (4 Cir. 1950); Terminal R. Ass'n of St. Louis v. Howell, 165 F.2d 135 (8 Cir. 1948).

5. Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1949); Ellis v. Union Pacific R. R. Co., 329 U.S. 649, 67 S.Ct. 598, 91 L.Ed. 572 (1947); Bailey v. Central Vermont Ry., Inc., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444 (1943).

6. Terminal R. Ass'n of St. Louis v. Howell, 165 F.2d 135 (8 Cir. 1948).

7. American Pacific Whaling Co. v. Kristensen, 93 F.2d 17 (9 Cir. 1937); Brittingham v. Ore S.S. Corp., 62 F.2d 616 (4 Cir. 1933).

8. Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960); Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1949); Bailey v. Central Vermont Ry., Inc., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444 (1943); Southern Ry. Co. v. Fox, 339 F.2d 560 (5 Cir. 1965); West v. United States, 256 F.2d 671 (3 Cir. 1958); 2 Norris, The Law of Seamen § 688 (2 ed. 1962).

accident occurred. Whether the taxicab in which they were riding be considered as a "place" in which they were working or a "facility" or instrumentality provided for their use, the question is—did Texaco exercise reasonable care in selecting and providing the mode and means of transportation. The evidence disclosed that the taxi company was duly licensed and authorized to operate taxicabs by the government of Trinidad; Texaco's choice was limited as there were only two taxi companies so licensed and operating on the island; both were used from time to time by Texaco-Trinidad. There is no evidence that the cabs of one of the licensed companies were any better or safer than those of the other; there is no evidence to even suggest that an investigation by Texaco would have disclosed that the selected taxi company employed drivers who were notoriously careless, reckless, negligent, unqualified, incompetent, or accident prone. But even if there were such evidence to support a finding that Texaco had acted negligently and had failed to use reasonable care in the circumstances, the question presented would be for the jury and not for the court.

The court below next voiced the conclusion that the transportation contract between Texaco and the taxi company was "void" under 45 U.S.C.A. § 55, presumably because of the court's view that Texaco's purpose was to exempt itself from liability by contracting with another to perform a "nondelegable duty." The statute, which the court obviously deemed pertinent, reads in part as follows:

> "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void: * * *."

As we have stated, there was no legal duty on Texaco to provide its wholly owned, operated, and controlled transportation facilities on Trinidad. We are uninformed as to any cases upon which the court may have relied as supporting its interpretation and application of the statute. We have found two cases which, in the over-all view of the case taken by the lower court, might have been accepted by it as reliable authority.[9] But those cases are clearly distinguishable from the case at bar because of factual differences. In both, the contractors were performing operational duties for the railroad, duties which would, in fact, warrant the conclusion that the contractors were "agents" of the railroads under the Sinkler doctrine. We find the statute inapplicable here.

We are of the opinion that the District Court erred in denying Texaco's motion for a directed verdict.

Reversed.

SOBELOFF, Circuit Judge (dissenting):

In overturning these judgments in favor of one injured seaman and the surviving dependents of another, the court, I submit, takes too narrow a view of the Supreme Court's holding in Sinkler v. Missouri Pacific R. R. Co., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958). That case emphasizes that an "accommodating scope" must be given to the word "agents" in order to effectuate the purposes of the Federal Employers' Liability Act.[1]

We are dealing here with no simple case of "independent contractor." As Sinkler teaches, a finding that the cab owner was an independent contractor does not end the inquiry. He may still be an agent within the FELA if he is an integral part of the employer's enterprise and is performing an "operational activity," particularly a statutory obligation due an employee. We must consider

---

9. Erie R. Co. v. Margue, 23 F.2d 664 (6 Cir. 1928); Eddings v. Collins Pine Co., 140 F.Supp. 622 (N.D.Cal.1956).

1. The standards for determining an employer's liability under the FELA have been incorporated into the Jones Act. 46 U.S.C.A. § 688 (1958).

the nature of the employer's business, the relationship of the so-called independent contractor to the employer, and the character of the duty owed by the employer to the two seamen which was being carried out by the driver at the time of the collision.

What may have seemed at common law to be a self-evident proposition—that an employer is immunized from liability to his employee for an independent contractor's negligence—no longer necessarily prevails since the enactment of the FELA.[2] To prevent "erosion" of this law by "narrow and niggardly construction," Rogers v. Missouri Pacific R. R. Co., 352 U.S. 500, 507–509, 77 S.Ct. 443, 1 L.Ed.2d 493 (1956), we are admonished by Sinkler to take a broad view of the "operational activities" test.[3] We must strive to envisage the entire pattern of acitivies performed for Texaco by the two "taxicab" owners, John Abhiram and Willie Chattergoon, rather than isolating and focusing on one single incident— the trip on which the seamen were injured—as though it were unrelated to other events and to Texaco's total enterprise. The carriage in question was not a casual transaction. It was part of an established system in the conduct of the defendant's business.

Texaco, Inc., through a wholly owned subsidiary, maintains an oil refinery at Pointe-a-Pierre on the island of Trinidad.

Texaco's vessels regularly visit there, take on cargoes from the refinery and embark for various ports. On April 17, 1963, the S.S. TEXACO WISCONSIN, one of the defendant's tankers, was loading a cargo of oil, intending to proceed via the Panama Canal to San Diego, California, when two of the crew, Hopson and Reynolds, became ill. The master concluded that they should not continue on the voyage as they required more expeditious treatment. He decided to arrange for their discharge and repatriation. For this purpose it was necessary for the master and the ill crewmen to present themselves to the American consul at Port-of-Spain, 38 miles from Pointe-a-Pierre; for under the law only the consul is authorized to discharge an American seaman in a foreign port.

Texaco maintained a fleet of automobiles for use chiefly within the confines of the refinery; but for the carriage of persons and documents beyond the refinery enclosure it had a standing arrangement with two cab owners, John Abhiram and Willie Chattergoon. Each handled about half of this Texaco business, which consisted of frequent trips to Port-of-Spain, the capital and principal city of Trinidad.[4] They also made trips to Texaco's infirmary, located about five miles from the refinery. Texaco availed itself of this service exclusively and regularly—"quite a lot" according

2. At common law the doctrine of *respondeat superior* did not extend to cases where an independent contractor's negligence caused an employee's injury. This was the rule applied in the lower court in Sinkler and rejected by the Supreme Court as inappropriate in FELA cases where the independent contractor was engaged in an "operational activity" on behalf of the employer.

Even at common law, however, as Justice Brennan points out in Sinkler, a number of courts recognized that merely labeling a relationship as "independent contractor" did not shield an employer from liability when the negligence arose in the performance of certain phases of the carrier's activities.

3. "[J]ustice demands that one who gives his labor to the furtherance of the enter-

prise should be assured that *all combining their exertions with him in the common pursuit* will conduct themselves in all respects with sufficient care that his safety while doing his part will not be endangered. If this standard is not met and injury results, the worker is compensated in damages." 356 U.S. at 330, 78 S.Ct. at 762. (Emphasis added).

4. Port-of-Spain is the capital, largest city and principal port in Trinidad. The embassies of six nations—France, Germany, Netherlands, Venezuela, Lebanon and the United States—are located there, as well as High Commissions of four others—including Britain, Canada and India. See 1964–65 Statesman's Yearbook (S. H. Steinberg ed.) p. 538.

to Texaco's shipping agent. One of the taxicab owners testified that he made two or three trips a week carrying documents or personnel to Port-of-Spain for Texaco.

On the occasion in question one of these, Abhiram, was selected by the husbanding agent of the tanker to take the master and the ill crewmen to the consul.[5] On the way, the cab collided with a bus; Reynolds was killed and Hopson seriously injured. The question of the cab driver's negligence was contested in the District Court but, the jury having found that his negligence was the cause of the collision, Texaco does not dispute the point in this court.

It is conceded that the two crewmen were still in the ship's service at the time of the collision. It is not denied that 46 U.S.C.A. § 682 strictly requires any discharge of a crewman in a foreign port to be made by a consular officer. The proposition the appellants advance, and which the court accepts, is that the ride on which the sick crewmen were being taken, in the company of the master, for the purpose of having them discharged by the consul and ultimately repatriated, was "simply a collateral activity," not an operational activity, and had "nothing to do with the actual operation of a ship," or as alternatively stated, was "not a part of Texaco's enterprise." To these restrictive characterizations I cannot consent.

It was indeed, as the majority opinion points out, not a *daily* task to transport sick seamen to the consul; but how significant is this? That on this particular occasion the passengers were a master and his ill seamen, while at other times the arrangement with Abhiram and Chattergoon was used to carry persons who were not sick and not expected to be discharged from service, is not a meaningful distinction. The answer turns on the nature of the habitual journeys of Abhiram and Chattergoon on behalf of Texaco, not on the frequency with which seamen happen to fall ill and are taken ashore, whether for treatment nearby, or for discharge and repatriation with a view to treatment arranged for them elsewhere.

Abhiram and Chattergoon served Texaco regularly as the overall needs of the company required. In amplification of his testimony that Abhiram and Chattergoon were used "quite a lot," Carte further commented that "this car [Abhiram's] is used by us from day to day * * *"; and noted that the various ships' captains "used those cars all the time." In particular, when a Texaco ship was to put in at a port requiring prior consular certification, these drivers were used to take the necessary documents to the appropriate consulate in Port-of-Spain. The same arrangement was utilized whenever crewmen on Texaco's ships became ill and required treatment in Texaco's infirmary.[6]

Texaco's ships could not sail without consular certifications, and Texaco was required to provide medical care for its ill seamen. Thus these activities were clearly an essential part of its total shipping enterprise, and bringing the master and the sick seamen to the consul that morning falls within the term "opera-

5. Ramillay Abhiram was the actual operator of his brother John's vehicle. This circumstance does not affect the legal issue.

6. Carte acknowledged on deposition that if a crew member on a Texaco ship wanted or needed medical attention it was customary for the captain to notify the shipping agent to arrange for treatment at the Texaco infirmary, located outside the refinery area. In fact, Hopson himself had been taken to this infirmary by cab just two days before the accident.

The majority's analysis emphasizes the non-repetitiveness of travel to the consular office for the purpose of discharge and repatriation for treatment. In this view the more regular carriage of ill seamen directly to the infirmary would apparently come closer to satisfying the Sinkler test of operational activity. To my mind it draws an artificial distinction to exclude from the broad coverage of the Sinkler rule the carriage of seamen to the consul under the same arrangement by the same drivers in the same vehicles, for the same ultimate objective.

tional activity." This term is not limited to the manipulation of the ship's gear. It includes the recruitment of the crew and furnishing of maintenance and cure to seamen when ill. It is no undue extension of the term to include the transporting of seamen to the consulate preparatory to their discharge for repatriation. Caring for these ill seamen was no less an operational activity because it was not to be performed aboard the vessel.[7]

The fortuitous circumstance that the shipowner maintained its own vehicles for some purposes and had steady arrangements with two taxicab owners to run various errands between the pier and the consul's office, which is located at a somewhat greater distance, instead of using its own vehicles for all purposes, should not alter the responsibility of the ship. When a seaman becomes ill he is particularly in the master's care. In fact, the very trip that resulted in tragedy was an essential preliminary step in the performance of the inescapable duty of maintenance and cure.[8]

There is no valid ground on which to distinguish the instant case from Carney v. Pittsburgh & Lake Erie R. R. Co., 316 F.2d 277 (3d Cir. 1963). There the defendant railroad had a project near Youngstown, Ohio, on which the plaintiff was working. Rather than transfer the worker to Youngstown—where he could pay his own expenses—the railroad agreed to pay his room and board at the local YMCA. This arrangement with the railroad accounted for no more than 3% of the use of the Y's facilities. The employee was injured when he fell from a negligently maintained bed in the Y, and the railroad was held responsible on the theory that the Y was its agent. The court said:

> "[I]n supplying those services to plaintiff by arrangement with the railroad, [the Y] was performing operational activities of plaintiff's employer * * *. He was there under the specific agreement with his employer that he would retain his out of town status and that the railroad would pay for his living expenses." 316 F.2d at 279.

It is noteworthy that Carney could sleep in the Y or not, as he desired, while Hopson and Reynolds had no voice in the selection of the means used to effectuate their discharge and repatriation.

Nor can Texaco be absolved on the ground that it did not stand to "benefit" from taking Hopson and Reynolds to the consul, for it cannot possibly be maintained that the performance of its statutory duty to the men was not beneficial to it. Surely no test of operational activity is acceptable which inquires only whether the employer is directly benefited and rules out whatever benefits the employees. It is enough that the employer benefits from the employees' services as members of the crew. An employer will not be permitted to say that only what brings him direct profit is covered by the law, disregarding his concomitant obligation to the employees. The stark simplicity of the proposed test is insensitive to the underlying policy of the FELA and the Jones Act.[9]

---

7. The District Court stated that the case was controlled by Sinkler, and added that whether a theory of agency or nondelegable duty was employed, the same result would be reached. I agree that liability exists whether "agency and nondelegability" is viewed as an independent theory of liability or as a necessary emanation from the Sinkler rule.

8. This is not simply a case involving the duty to provide the seamen with a safe place to work. Their illness placed an additional duty on the shipowner to provide them with medical care, and Abhiram was actually assisting in this aspect of the ship's business.

9. See Mangrum v. Union Pacific R. R. Co., 230 Cal.App.2d 960, 41 Cal.Rptr. 536, (Dist.Ct.App.1964) (alternative holding), which points out that since a railroad is required to take care of its employees who are taken sick on duty—just as Texaco was required by law to care for these ill seamen—a doctor who provides such medical care benefits the employer and may be an FELA "agent," though otherwise an independent contractor. See also O'Donnel v. Pennsylvania R. R. Co., 122 F.Supp. 899 (S.D.N.Y.1954).

Within our own circuit, the transportation of workmen to and from their place of employment was recently held to be an "operational activity." Leek v. Baltimore & Ohio R. R. Co., 200 F.Supp. 368, 370 (N.D.W.Va.1962). The case was not appealed. There a railroad employee was permitted to recover under FELA for injuries sustained through the negligent operation of a taxicab provided by the railroad to take employees home at the end of the day. Similarly, taking the ill seamen to the consul for discharge and repatriation is an operational activity without which a ship cannot function as the statute requires. There is no legally significant difference between the transportation of an employee by an employer when he is released for the day and the transportation of crewmen preparatory to their discharge. Indeed, if there were any distinction, the present case would seem the stronger of the two.

A most exhaustive analysis of the Sinkler doctrine is found in Mangrum v. Union Pacific R. R. Co., 230 Cal.App. 2d 960, 41 Cal.Rptr. 536, 543–548 (Dist. Ct.App.1964). There a railroad was held liable for the negligence of a doctor retained by the employer to treat an ill employee. Although the doctor was a private practitioner on the staff of four different hospitals, received no salary from, and was subject to no control by, the railroad,[10] it was held:

> "[T]he doctor was engaged in an operational activity of the railroad, one necessary to carry out its franchise, * * * *for a railroad cannot operate properly without a full healthy crew."* Id. at 548. (Emphasis added.)

And the railroad was required to answer for the doctor's conduct as an "agent."

Similarly, the S.S. TEXACO WISCONSIN could not function without a healthy crew. The trip to Port-of-Spain to arrange for discharge of the ill seamen with a view to medical care was so intimately related to this function as to make it an operational activity and to make Abhiram an FELA agent.

The majority opinion prefers the reasoning of two pre-Sinkler cases to that of post-Sinkler decisions applying the "operational activities" standard. Neither of the two cases relied on by the court[11] discussed the "operational activities" concept under the FELA or under the common law. Moreover, McCall is distinguishable, for the crewmen had already been discharged.[12]

My brethren take "judicial notice" that it is "virtually impossible for a shipowner to carry its own shore-side means of transportation from one port to another or for it to own, operate, or control shore-side transportation facilities in every port and every part of the world." Preliminarily, it is to be noted that the defendant did have vehicular facilities at Pointe-a-Pierre, where it maintained a large refinery, shipping office, pier and other installations, and made use of its customary arrangement with Abhiram on the date of the collision.

. But more to the point, it is not unfair to suggest that a court should take judicial notice that the sick seamen were in a far less favorable position than their employer to arrange independent means of transportation to the consulate. Hopson and Reynolds were not on a mission of their own and the choice of means was not theirs. Their dependence upon the master was not a whit less in the car than at sea.

10. Under the Sinkler analysis, of course, the autonomy of the third party and his "freedom from detailed supervision of its operations," are irrelevant where operational activities of the employer are being performed. See 356 U.S. at 331, 78 S.Ct. at 763.

11. McCall v. Overseas Tankship Corp., 222 F.2d 441 (2d Cir. 1955); Socony-Vacuum Oil Co. v. Premeaux, 187 S.W.2d 690 (Tex.Civ.App.1945).

12. Judge Learned Hand's dictum in a one-sentence concurring opinion does not foreclose inquiry under the legal standards subsequently declared by the Supreme Court.

The proper approach in Jones Act cases was expounded over thirty years ago by Justice Cardozo for a unanimous Court:

> "[T]he act is to be liberally construed in aid of its beneficent purpose to give protection to the seaman and to those dependent on his earnings." Cortes v. Baltimore Insular Line, 287 U.S. 367, 375, 53 S.Ct. 173, 176, 77 L.Ed. 368 (1932).

This is the same philosophy taught by Sinkler. The language from Cortes which my brethren quote is, it seems to me, misapplied. The Court's opinion did observe that "[t]he conditions at sea differ widely from those on land, and the diversity of conditions breeds diversity of duties." The majority opinion seems to read Justice Cardozo's words as expressing a limitation of liability when a seaman is injured on land rather than aboard ship; but the entire context of the Cortes quotation makes clear that it was meant to enlarge, not contract, the protection afforded to seamen, for immediately thereafter the Court added, significantly, that "[o]ut of this relation of dependence and submission there emerges for the stronger party a corresponding standard or obligation of fostering protection."

This is not to say that the ship became an insurer of the seaman's safety on the journey to the consul's office. If injury had befallen the seamen on the way, without negligence on the part of the ship's agent, the ship would not be liable under the Jones Act. Nor is a carrier liable for negligence committed by its independent contractor in the performance of acts that do not constitute an operational activity. But it ignores the essence of the matter to treat this undertaking in the execution of a statutory duty to employees like the simple case where a defendant has accommodatingly called a taxicab for one wishing to go somewhere on his own business.[13]

It is more consonant with justice and the spirit of the Jones Act for the shipowner to be held to its statutory obligation in the present action and then for it to bring suit as subrogee against Abhiram in Trinidad where the shipowner does business regularly, than to remit the plaintiffs to their remedy against Abhiram in distant Trinidad.

In summary, Texaco having arranged with Abhiram and Chattergoon to serve its transportation needs between Pointe-a-Pierre and Port-of-Spain, rather than performing this work with its own vehicles, this carriage was an operational activity no less than the switching of cars in Sinkler, the transportation by taxicab in Leek, the use of the YMCA's beds in Carney and the doctor's services in Mangrum.

I would affirm the judgments of the District Court.

13. It is not necessary to pass on the additional ground for decision mentioned by Judge Butzner, based on section 55 of the FELA, which provides that:
"Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt himself from any liability created by this chapter, shall to that extent be void * * *." 45 U.S.C.A. § 55 (1958).
Here, we cannot say that we have a devious device calculated to avoid tort liability, for it does not appear that it was so motivated. But neither did the Supreme Court in Sinkler seek such motivation in the arrangement between the railroad and the Belt line. Section 55 does, however, evidence the firm congressional design of affording broad protection to the employees covered by the statute.