John C. MOUNTEER, Plaintiff,

v.

MARINE TRANSPORT LINES, INC. and United States of America, Defendants.

No. 77 Civ. 4347 (GLG).

United States District Court, S. D. New York.

Jan. 12, 1979.

As Amended Jan. 24, 1979.

Markowitz & Glanstein, New York City, for plaintiff by Steven Thaler, New York City, of counsel.

Robert B. Fiske, Jr., U. S. Atty., New York City, for defendants by Gilbert S. Fleischer, Atty. in Charge, Torts Branch, Civil Div., U. S. Dept. of Justice, New York City by Craig S. English, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

Defendants move for summary judgment. The plaintiff, in a refreshing instance of

candor, acknowledges that there are no factual issues preventing resolution of the motion and concedes that it is a matter of law—in fact, an important legal issue. The acknowledged facts are as follows:

The United States owns the USNS Sealift Atlantic, a tank vessel. It has bareboat chartered the vessel to Marine Transport Lines, Inc. ("MTL"), which operates it exclusively for the United States.

In November of 1976, the Sealift Atlantic was at Port Said in Egypt (more properly the United Arab Republic). The ship was in need of a Third Assistant Marine Engineer.[1] MTL had an agreement with the Marine Engineers Beneficial Association (the "Union") under which it obtained all of the engineers employed by it (except for Chief Engineers) from the Union. Pursuant to this collective bargaining agreement, MTL had the right to select personnel whom it considered qualified and satisfactory, and the captain of the vessel, upon the reporting of engineers, could accept or reject them. If rejected as unsatisfactory, the Union agreed to furnish a prompt replacement; if accepted, the engineer's pay would be calculated retroactively from the date of his dispatch from the Union.

MTL advised the Union that it needed a Third Assistant Marine engineer for assignment to its vessel in Port Said, and instructed the Union to send the replacement to its New York office to report to its dispatcher. The plaintiff, John Mounteer, a Marine engineer who held qualifications for the position, accepted the assignment. He was examined at the Union's diagnostic center and found physically fit. He met with MTL's dispatcher who made arrangements to fly him to Cairo. The dispatcher also telexed to its agent in Egypt, El Menia Shipping Agency, instructions to meet Mounteer at the airport and arrange for his transportation from Cairo to Port Said (an overland trip of some 150 miles).[2]

Mounteer arrived in Cairo on November 5, 1976 and was met by MTL's agent. The agent then escorted him to a taxi selected by the agent and he was sent on his way to Port Said. In the desert, approximately halfway between Cairo and Port Said, the taxi was involved in an auto accident resulting in injuries to the plaintiff. The plaintiff was hospitalized in Egypt for about three weeks. MTL paid his Egyptian medical and hospital expenses, his living expenses in Egypt after discharge from the hospital, and made arrangements and paid for his return flight to the United States, where he received further medical treatment. Of necessity, he never reached the Sealift Atlantic or signed articles aboard the vessel.

The plaintiff sued both the owner of the vessel, the United States of America, and MTL for his injuries, loss of wages, and maintenance and cure. The action was brought in admiralty pursuant to 46 U.S.C. § 688 (the Jones Act) and, alternatively, 46 U.S.C. §§ 781–90 (the Public Vessels Act) and 28 U.S.C. § 2671 et seq. (the Federal Tort Claims Act). It appears that of the jurisdictional bases claimed, only the Jones Act is potentially applicable.[3]

---

1. Indeed, plaintiff contends (and defendants have not denied) that the vessel could not sail until the relief engineer had arrived since the vessel was legally understaffed without him.

2. MTL also prepared a letter for the Egyptian immigration authorities, as required by their law, guaranteeing Mounteer's financial responsibility during his overland trip to the vessel.

3. The other bases claimed for jurisdiction over the United States are patently inapplicable. The Extension of Admiralty Jurisdiction Act (46 U.S.C. § 740) extends the jurisdiction of the United States Courts to include injuries "caused by a vessel on navigable waters notwithstanding that such damage or injury be done or consummated on land." The USNS Sealift Atlantic did not cause plaintiff's injury except in the most remote sense. No case has been cited giving the Extension Act such a sweeping scope to include claims like plaintiff's.

With respect to the Federal Tort Claims Act (28 U.S.C. § 2671 et seq.), sovereign immunity has not been waived for claims arising in a foreign country. Section 2680(k) specifically excludes such cases. United States v. Spelar, 338 U.S. 217, 70 S.Ct. 10, 94 L.Ed. 3 (1949); Orion Shipping & Trading Co. v. United States, 247 F.2d 755 (9th Cir. 1957). That act, therefore, does not support jurisdiction in this case.

With respect to the Jones Act claim, the defendants' motion rests upon the authority of two moderately old, but never overruled, Second Circuit cases. In the first of these, *Miller v. Browning S.S. Co.*, 165 F.2d 209 (2d Cir. 1947), the plaintiff was dispatched by the union, boarded the vessel, and, while going to report for work, fell into an open hatch. The collective bargaining agreement with the union was, so far as applicable, similar to that here, although no transportation was provided since the vessel was then in the same city as the union. The court held that the plaintiff had not yet become a Jones Act employee since the shipowner had the opportunity to reject· him. Because he was not yet employed by the defendant, he could not make a claim under the Jones Act.

Eight years later, in *McCall v. Overseas Tankship Corp.*, 222 F.2d 441 (2d Cir. 1955), the court was confronted with the opposite end of the employment period. The seaman had served aboard the defendant's vessel. He was discharged in a foreign port along with the rest of the crew. The defendant ship line, which was responsible for their carriage home, contracted with a scheduled airline to fly the entire crew back to the United States. On this flight the plane struck a mountain in Alaska, killing the seaman. Although the defendant was responsible for wages and subsistence until return to the United States, as well as providing transportation, the court held that the deceased seaman was no longer in the employ of the ship as a seaman at the time of the crash and was, therefore, not in the course of employment within the meaning of the Jones Act. The court noted that, although the defendant was required to provide transportation, the seaman was at liberty to refuse it and go wherever else he wished:

> "Overseas had no right to his time or services and could give him no orders, either in Shanghai or after he got home. The fact that he might later be reemployed as a seaman on another of Overseas' tankers does not make what he was doing in the meantime maritime employment. [Footnote omitted]. Hence the

fatal airplane trip was not something done in the course of his employment as a seaman. Even though both parties knew when he signed the shipping articles and when he signed off, that he expected to use the air transportation arranged by Overseas, his acceptance of it was something done at his own election and after his employment had ceased. This distinguishes the cases relied upon by the appellant which hold that when an employer furnishes an employee transportation to or from his place of employment, an injury sustained by him during the transportation is deemed to have been in the course of employment."

*Id.* at 443–44.

While these decisions can be factually distinguished (in *Miller* transportation was not provided and in *McCall* services as a seaman had been completed), realistically it would appear that, if this case had been submitted to the Second Circuit a generation ago, the court would have found no liability for the defendants under the Jones Act. The question, however, is whether those decisions, although never overruled or criticized, are still good law in light of the Supreme Court's decision in *Hopson v. Texaco*, 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740 (1966), and subsequent decisions of other circuit courts of appeals.

The *Hopson* case arose in the Fourth Circuit. The district court had entered judgment for the plaintiffs. The Court of Appeals for the Fourth Circuit reversed, finding that the injuries suffered by the seamen who were travelling in a taxicab on their way to the United States Consul's Office for repatriation were not an "operational activity" of the shipowner, and that the taxi driver was an independent contractor. The court relied, *inter alia*, upon the Second Circuit's decision in *McCall*. (Circuit Judge Sobeloff, dissenting, noted that *McCall* was distinguishable since the crewmen in that case had already been discharged, while these plaintiffs could not be signed off until they had reached the office of the American Consul.)

In a per curiam opinion, the Supreme Court reversed.[4] The Court noted that the Jones Act incorporates the standards of the Federal Employers Liability Act and that in *Sinkler v. Missouri Pacific R.R.*, 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958), the Court had held that that Act's rendering of an employer liable for its agent's actions included those caused in whole or in part by persons performing under contract operational activities of the employer. Consequently, since the ship had an obligation to transport the men to the United States Consul and to arrange their return to the United States, and since the ship selected the taxi service, it was responsible for the negligence of the taxi driver.[5]

The Supreme Court's opinion did not cite either of the Second Circuit precedents and both are factually distinguishable since in *Hopson* there was transportation during an admitted period of employment. However, the attitude of other courts of appeals since *Hopson* has been much more liberal in finding Jones Act coverage for seamen being transported to or from job assignments.

In *Magnolia Towing Co. v. Pace*, 378 F.2d 12 (5th Cir. 1967), a commuting tugboat pilot on his way to join a vessel, in transportation provided by the employer, was found to be in the course of his employment. The plaintiff in that case had a continuing employment relationship with the defendant, although he occasionally changed tugs, so that it was difficult to say in which tug he was "in service." In a later Fifth Circuit case, *Vincent v. Harvey Well Service*, 441 F.2d 146 (5th Cir. 1971), the Court gave a more philosophical consideration to the question of the Jones Act status of seamen being transported to vessels. The plaintiff in that case was a seaman on an amphibious drilling rig. He was injured while riding as a passenger in an automobile furnished by the employer and driven by a paid fellow employee from pierhead to an assembly

point 50 miles away. The court reviewed other transportation cases and sought the outside limits for satisfying Jones Act jurisdiction where the seaman has not been absent from the vessel on ship's business. The court did not find this an easy question:

> "Of course, once we get away from the easy situation of activity done off the ship at the express direction of the employer, complications set in. Not the least of these is the fact that the litany 'in the service of the ship' is of little more help than the reprise 'in the course of his employment.' Each is essentially circular and question-begging—a statement of the problem, not the solution. At this point the law has to fall back on the traditional escape hatch—it all depends. The peculiar factors here assume decisive importance, some depending ultimately upon the factfinder's conclusions, others as a matter of law and most as a mixture of both. Some will, some will not, be in the service of the ship."

*Id.* at 148–49 [footnote omitted].

The court then went on to consider the factors which demonstrate the employer's interest in the travel. It concluded that the nature of Vincent's service, as well as his relationship to the operation of the defendant's rig, made out an occurrence in the "service of the ship":

> "Not out of heartfelt charity, but from the most worldly self-interest the employer supplies free transportation for he knows the employees know that such economic cost must be borne by someone, somehow. If the employee is to bear it, wages must be increased or job-attractiveness will be diminished. And to these employer interests may be added the convenience and reliability flowing from each tour's departing at predetermined locations and times."

*Id.* at 149.

Using this approach, MTL's transporting of Mounteer across the Egyptian desert, to

---

4. Justice Harlan dissented, believing that *Sinkler v. Missouri Pac. R.R. infra*, should not be extended.

5. The distance to the United States Consul's Office from the ship's location was 38 miles.

The ship had a fleet of motor vehicles available for transportation but its practice was to utilize one of two local taxicab companies for journeys to these more distant points.

join the stranded vessel, was for the service of the ship from MTL's standpoint. However, there is another aspect which must be considered in weighing the viability of the Second Circuit precedents.

In the *McCall* case, Judge Learned Hand concurred in a brief opinion which sought to avoid the issue of employment by relying solely upon the fact that the airline company was an independent contractor whose negligence could not be imputed to the ship line. Defendants have wisely not sought to assert that as a grounds for summary judgment in this case. Since *Sinkler* and *Hopson*, a finding of independent contractor does not resolve the question. Although the transporting company is an independent contractor, it may still be an agent for Jones Act purposes if it serves as an integral part of the employer's enterprise and performs an "operational activity," particularly if the activity is a statutory obligation for the benefit of the employee. It has been suggested that the factors to be considered are the nature of the employer's business, the relationship of the so-called independent contractor to the employer, and the character of the duty owed by the employer to the seaman which was being carried out at the time of the accident.[6] For this reason, it is worth pointing out that there may be a difference between the relative responsibilities of the two defendants. The fact that the plaintiff had not become a member of a specific crew, however, would not seem to affect MTL's liability as the employer of the seaman. *Magnolia Towing Co. v. Pace*, 378 F.2d at 13.

In its papers in support of its motion, the defendants have not attempted to distinguish between their relative liabilities under the Jones Act. Since the ship owner United States had apparently parted with possession, the crew would usually not be said to be in its employ. Gilmour & Black, *Law of Admiralty* 242 (1975); *Bergan v.*

*International Freighting Corp.*, 254 F.2d 231 (2d Cir. 1958). From this standpoint, Jones Act jurisdiction might exist *only* as to MTL.[7]

Plaintiff attempts to overcome the absence of an employer-employee relationship with the United States by alleging in the complaint that he was in the employ of the United States aboard the vessel "through its agents and representatives." The agents are not described, but it is apparent that plaintiff refers to MTL. We have here, therefore, a unique situation of a purported "bareboat charter" where the vessel is being operated for the exclusive benefit of the owner. Under these circumstances, it is difficult to see how there has been a true demise of the vessel. Even if there has been a technical demise, MTL would be in the position of an independent contractor performing services for the United States. In this instance, we would have to apply the factors considered above with respect to whether the interpositioning of an independent contractor relieves the beneficial employer of his responsibility to the seaman.

This interesting question has not been briefed by the parties. It is likely that it is not a matter of consequence to the defendants (who are jointly represented) since their arrangements no doubt contemplate that claims of this nature will ultimately be paid by the United States, regardless of the entity against which judgment is entered. On the papers before us, we are unable to decide whether the plaintiff was an employee of the United States, as well as being an employee of MTL. But as to his status as a Jones Act employee, and leaving aside the question of who his employer was, the Court concludes that plaintiff has stated a claim within the Jones Act.

While it is always difficult to predict how a three-judge panel drawn from a Court of

---

6. *See Hopson v. Texaco, Inc.*, 351 F.2d 415, 423–24 (4th Cir. 1965) (Sobeloff, J., dissenting), which was largely adopted by the Supreme Court in its reversal of the majority opinion of the Fourth Circuit.

7. While there may also be diversity jurisdiction between MTL and plaintiff, it has not been alleged. MTL's citizenship is not set forth, either in terms of its state of incorporation or its principal place of business.

**720**

Appeals composed of nine (soon to be eleven) active judges and half a dozen or more active senior judges (to say nothing of visiting judges and lower court judges sitting by designation), would decide a case like this one, in light of relatively old and somewhat undermined precedents, this Court is persuaded that the earlier precedents should be overruled or distinguished and the plaintiff's claim as a Jones Act seaman upheld. Accordingly, the motion for summary judgment is denied.

SO ORDERED.

ADDENDUM TO OPINION NO. 48084

GOETTEL, District Judge:

The Court is in receipt of a letter from defendants' attorney stating that the opinion in this matter dated January 12, 1979, is in error in stating that the United States is the owner of the USNS SEALIFT ATLANTIC. He advises that the Government has chartered the vessel from an unidentified owner.

The complaint in the action alleges that the United States owns the vessel. The answer admits:

"that at all times mentioned in the complaint, defendant, United States of America, operated, managed and controlled under bareboat charter the USNS SEALIFT ATLANTIC, a public vessel of the United States, by and through its public vessel operating agent, Marine Transport Lines, Inc., which, pursuant to contract, manned, victualed, supplied and navigated the USNS SEALIFT ATLANTIC at its own expense and by its own procurement subject to reimbursement by the United States of America, for and on behalf of the United States Navy, exclusively, on national defense missions and in the public service of the United States."

The statement of material facts submitted on the motion, as to which the defendants contended there was no genuine issue, stated that:

"The USNS SEALIFT ATLANTIC is a tank vessel bareboat chartered by the United States of America and operated exclusively for the United States by its agent Marine Transport Lines, Inc. (MTL)."

The rather convoluted language of the foregoing, coupled with a failure to indicate the identity of the owner of the vessel, led the Court to conclude that the vessel was chartered by the Government to MTL, rather than to the Government by the unidentified owner.

■ Since the Government does not own the vessel, it might be argued that this eliminates one possible exposure to liability for plaintiff's claim. However, since there has been no demise of the vessel to MTL, it would not appear (as was considered in the prior opinion) that the Government was divested of responsibility for the seaman employed aboard the vessel. Indeed, in this sort of arrangement, the vessel being operated for the exclusive use of the United States, it is liable under the Jones Act even though it is not technically the seaman's employer. *Petition of the United States*, 367 F.2d 505 (3d Cir. 1966). Consequently, the correction of the ownership status of the vessel in no way affects the conclusions reached with respect to the defendants' motion. The decision is, with this addendum, adhered to in all respects.

SO ORDERED.